Robert STALNAKER, Administrator of the Public Employees' Retirement System, Appellant,

v.

Mary Ann WILLIAMS, Appellee.

Nos. S–7751, 5003.

Supreme Court of Alaska.

June 12, 1998.

John B. Gaguine, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellant.

William J. Soule, Law Office of William J. Soule, Anchorage, for Appellee.

Robert M. Johnson, Wohlforth, Argetsinger, Johnson & Brecht, Anchorage, for Amicus Curiae, Public Employees' Retirement Board.

MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

EASTAUGH, Justice.

## I. INTRODUCTION

Robert Stalnaker, administrator of the Public Employees' Retirement System, challenges two superior court decisions that reviewed administrative rulings by the Public Employees' Retirement Board. The superior court decisions would allow Mary Ann Williams, a former state employee, to recover occupational-disability benefits and attorney's fees. We affirm.

## II. FACTS AND PROCEEDINGS

From 1977 to 1990, Mary Ann Williams worked for the State of Alaska in the Child Support Enforcement Division (CSED). She went on medical leave in July 1990 and did not return to work. In September 1990 Williams applied for occupational-disability benefits from the Public Employees' Retirement System (PERS), claiming that work-related stress had caused various physical and psychological problems. In December 1991 the PERS Director decided that Williams was not eligible for occupational-disability benefits, but was eligible for nonoccupational-disability benefits. Williams appealed the denial of occupational-disability benefits to the Public Employees' Retirement Board (PERB or Board).[1]

The Board heard Williams's appeal in October 1992 and, by a vote of four to two, affirmed the Director's denial of occupational-disability benefits. The Board's decision explained that Williams's had not "demonstrated by a preponderance of the evidence [that her condition would] presumably permanently prevent [her] from satisfactorily performing [her] duties." Thus, the Board did not decide whether her disabilities resulted from her employment.

Williams appealed the Board's decision to the superior court. Judge Donald D. Hopwood found that the Board had not paid sufficient attention to the statutory language requiring applicants for benefits to show that they are "presumably permanently" disabled.[2] Judge Hopwood reasoned that the PERB had erroneously required Williams to prove that she was permanently disabled, using a definition of "permanence" derived from workers' compensation law. He outlined a definition of "presumably permanent" and remanded the case to the PERB, ordering the Board to reconsider the case in light of that definition and to decide whether Williams's condition had occurred in the course of her employment.[3]

On remand the PERB considered the evidence from the previous proceedings as well as new testimony and documentary evidence

1. After leaving her job in 1990, Williams also applied for workers' compensation benefits under AS 23.30, based on the same claims as those before the PERB. The Alaska Workers' Compensation Board (AWCB) refused to grant benefits for either the physical or mental disabilities she claimed. The AWCB issued its decision after Williams had appealed to the PERB but before the PERB had held a hearing. In July 1992 the PERB ruled that collateral estoppel prevented Williams from arguing her claims for physical injuries allegedly arising out of her employment, because the AWCB had conclusively decided that issue. In the same decision, the PERB ruled that Williams was not collaterally estopped from proceeding with her claims for PERS benefits based on nonphysical disabilities arising out of her employment; the PERS standard of proof for those claims differed. Therefore, the PERB agreed to hear Williams's appeal for PERS benefits for mental disabilities allegedly resulting from her employment.

2. To approve an award of nonoccupational-disability benefits, the Director had to have concluded that Williams was "presumably permanently" disabled. Judge Hopwood held that the Director's decision did not bind the PERB; no statute or regulation required the PERB to defer to the Director's determinations; and the doctrine of estoppel did not apply.

3. Judge Hopwood's remand was not immediately appealable because it was not a final judgment. When a superior court sits as an intermediate appellate court and remands a case to an administrative agency for further proceedings, the remand is not considered a final judgment. Alaska R.App. P. 202; City of North Pole v. Zabek, 934 P.2d 1292, 1295–96 (Alaska 1997); City of Juneau v. Thibodeau, 595 P.2d 626, 629–30 (Alaska 1979).

regarding the "presumed" permanence of Williams's condition. After conducting a two-day hearing in June 1994, attended by six of the seven PERB members, the PERB concluded by a vote of four to two that Williams was presumably permanently disabled. On the question of whether her disability had resulted from her employment, however, the Board tied three to three. The Board ruled that a majority of the Board was required to overturn a decision of the Director; thus, it concluded that the tie vote affirmed the Director's denial of benefits. At the time, no PERS regulation addressed the effect of a tie vote.[4]

Williams again appealed to the superior court, asserting that a tie vote rendered no decision on the proximate cause of her disability. In February 1996 Judge Karen L. Hunt ordered the Board to have the member who was absent from the June 1994 hearing review the record and issue a tie-breaking decision. The court denied PERB's request for reconsideration of this order.

After reviewing the record, the Board member who had been absent from the June 1994 hearing found that Williams was suffering from an occupational disability. He signed a supplement to the Board's decision, effectively reversing the Director's denial of occupational-disability benefits for Williams's mental condition. Judge Hunt then awarded Williams one hundred percent of her claimed attorney's fees ($11,480) plus costs. Judge Hunt later modified that order by awarding eighty-six percent of actual attorney's fees plus costs.

Robert Stalnaker, the PERS administrator, appeals Judge Hopwood's decision remanding the case to the Board, Judge Hunt's decision regarding the effect of the Board's tie vote, and Judge Hunt's award of attorney's fees.

## III. DISCUSSION

### A. Judge Hopwood's Remand to the Board

#### 1. Standard of review

■ "In an appeal from a judgment of a superior court acting as an intermediate

court of appeal, we give no deference to the superior court decision. Rather, we independently review the agency decision." *Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n*, 836 P.2d 343, 348 (Alaska 1992). We use our independent judgment in reviewing the superior court's legal conclusion that the PERB applied the wrong definition of "presumably permanently" disabled. In doing so, we must use our independent judgment in deciding whether the Board applied the wrong standard. *See id.* (stating that we apply our independent judgment to legal questions that do not involve agency expertise).

### 2. Did the Board apply an incorrect definition of "presumably permanent"?

■ An employee seeking occupational-disability benefits must prove that his or her employment was "terminated because of a total and apparently permanent occupational disability, as defined in AS 39.35.680, before the employee's normal retirement date." AS 39.35.410. An "occupational disability" is:

a physical or mental condition that, in the judgment of the administrator, *presumably permanently* prevents an employee from satisfactorily performing the employee's usual duties for an employer or the duties of another comparable position or job that an employer makes available and for which the employee is qualified by training or education.

AS 39.35.680(26) (emphasis added). The debate in Williams's appeal focuses on whether the Board required a showing of permanence instead of presumed permanence.

Judge Hopwood found that the Board had incorrectly required Williams to prove that her disability was permanent—that it would certainly not improve during her lifetime. He noted that the Board relied almost exclusively on testimony from one medical expert, Dr. Samson, and that Dr. Samson's definition

4. Stalnaker asserts that a subsequently promulgated regulation, to be published at 2 Alaska Administrative Code (AAC) 35.170(c), provides that a tie vote of the Board affirms the administrator's decision.

of permanence omitted the key word "presumably."[5] Stalnaker challenges Judge Hopwood's ruling, arguing that the Board used the correct standard in the October 1992 hearing. Thus, Stalnaker argues that Judge Hopwood's decision to remand was improper and should be reversed.

The parties have not argued that Judge Hopwood adopted an erroneous definition of "presumably permanent." Judge Hopwood explained:

[A]n employee who is seeking occupational or nonoccupational disability benefits under the PERS statutes must prove by credible evidence that her condition is more likely than not permanent. If the employee meets that burden, her condition is presumably permanent and she is entitled to disability benefits.

Judge Hopwood also explained that the Board retains its discretion to assess the credibility of witnesses and the reliability of conflicting evidence; the Board need not accept all evidence that tends to prove the existence of a disability. Thus, "presumably permanent" is not a presumption; it does not shift the burden of proof of a disability from the employee to the employer.

The Board's decision and the hearing transcript do not clearly indicate which definition the Board required Williams to meet.[6] The

Board, however, stated that it gave more weight to the testimony of Dr. Samson than it did to that of any other witness. Dr. Samson testified that he never considered Ms. Williams permanently disabled; he considered her disability to be temporary and had suggested that she take a few weeks or months off work and, perhaps, consider changing jobs.[7] He also had not realized until shortly before testifying that he would be asked to testify about whether Williams suffered from a "presumably permanent" condition.[8]

The Board chair asked Dr. Samson to clarify what he meant by "permanent." Judge Hopwood cited this exchange when explaining his conclusion that the Board had misconstrued the presumed permanency requirement. Dr. Samson had explained that he believed that a "temporary" condition might require three to four years of treatment, but that he believed a "permanent" condition would last a lifetime. The Board chair did not ask him what he understood a "presumably permanent" condition to be. The Board relied very heavily on Dr. Samson's testimony. Judge Hopwood concluded that the Board must have relied on Dr. Samson's definition of permanency.

Although it is a close question, we agree with Judge Hopwood's conclusion that the

5. Two other medical experts testified about the permanence of Williams's condition, but the Board discounted their testimony. The Board explained:

There was conflicting evidence concerning whether Ms. Williams's disabling mental condition was presumably or apparently permanent at the time of her termination. The Board finds more persuasive the testimony of Dr. Samson, Ms. Williams's treating psychiatrist, that Ms. Williams's condition was not permanent, than the contrary testimony of other witnesses. In particular, the Board gives more weight to Dr. Samson's opinion than to the opinions of either Dr. Franklin, who neither examined nor treated Ms. Williams, or Dr. Kappes, who acknowledged that he would not testify against a client's interest.

6. The Board stated that it gave much weight to the opinion of Dr. Samson, who did not apply the "presumably permanent" standard. But the Board also stated that Williams's condition "was not demonstrated by a preponderance of the evidence to presumably permanently prevent" her from performing her job duties.

7. Dr. Samson explained that, "[i]n at least one or two points during treatment with me, I agreed with her taking a few weeks or a few months off. That's a temporary disability. My expectation was that someone takes off a few months, come back to the situation and see what's going on." Dr. Samson also explained:

There were, I think, one time or maybe even a couple of times, where her degree of distress was significant enough that I felt that getting away from work, and not having to deal at least with that particular part of [her] life, would have been helpful. And that's the context in which I recommended that she take some time off. If calling it a disability or partial temporary disability or whatever, is what it takes to get people to be able to use their sick leave to do that, that's how I do it.

8. Ms. Williams's attorney asked Dr. Samson, "When did you find out that, for the first time, that for PERS' purposes, there had to be a presumed permanent disability?" Dr. Samson replied, "I think last night."

Board applied an incorrect definition. The Board's clearest indication of the definition it applied comes from Finding of Fact No. 8:

> There was conflicting evidence concerning whether Ms. Williams's disabling mental condition was presumably or apparently permanent at the time of her termination. The Board finds more persuasive the testimony of Dr. Samson, Ms. Williams's treating psychiatrist, that Ms. Williams's condition *was not permanent,* than the contrary testimony of other witnesses.

(Emphasis added.) That language suggests that the Board was looking for evidence of a permanent, rather than presumably permanent, disability. Judge Hopwood did not err in remanding to the PERB.

### B. *Judge Hunt's Determination of the Effect of a Tie Vote*

#### 1. *Standard of review*

■ We have found no Alaska case that indicates which standard of review to apply to an agency's choice of procedures in the absence of a relevant agency provision. We will treat this as an issue of law, which we decide by applying our independent judgment. We will "adopt the rule of law that is most persuasive in light of precedent, reason and policy." *Brooks v. Brooks,* 733 P.2d 1044, 1055 (Alaska 1987) (citation omitted). We decline to deferentially review the Board's adoption of a "tie affirms" practice in this case, because the Board did not adopt that practice in advance of the hearing by generally applicable rule or regulation, and did not inform Williams that it would adopt any such practice until after the hearing had been conducted, the vote taken, and the decision issued. Nothing in the record indicates that the Board, in adopting the "tie affirms" practice for this case, invoked its expertise in interpreting the agency's enabling statutes. See *University of Alaska v. University of Alaska Classified Employees Ass'n,* 952 P.2d 1182, 1184–85 n. 6 (Alaska 1998) ("Where it appears that the agency has not invoked its expertise, we apply the substitution of judgment standard and review questions of law independently.").

We therefore do not defer to the decisions of the Board or the intermediate appellate court.

#### 2. *Is the Board more analogous to a trial court or an appellate court?*

■ The parties dispute whether the Board is analogous to a trial court or an appellate court. Williams contends that the Board plays the role of trial court, and cannot end its deliberations with a tie vote (a hung jury, in her analogy) because it must render a decision. Stalnaker argues that the Board is more akin to an appellate court, in that it reviews the administrator's decision and overturns it only if a majority agrees to do so. Absent a different rule of procedure, appellate courts, including our own, commonly apply a "tie affirms" policy to resolve issues on which the appellate jurists are equally split. See, e.g., *Neil v. Biggers,* 409 U.S. 188, 191–93, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Hayes v. A.J. Assocs., Inc.,* 960 P.2d 556, 572 (Alaska 1998); 5 Am.Jur.2d *Appellate Review* § 832 (1995).

Like an appellate court, the Board is empowered "to act as an appeals board, hold hearings at the request of an employer, employee, surviving spouse or a beneficiary on decisions made by the administrator, and submit its findings to the administrator." AS 39.35.040(4). Thus, it only reviews cases on appeals from the decisions of the administrator; as Stalnaker points out, it is not the initial fact finder. The Board's written decision sets forth findings of fact and conclusions of law; it "is the final administrative decision required for purposes of appeal to the superior court." 2 AAC 35.180; *see also Powers v. State,* 757 P.2d 65, 67 (Alaska 1988).

Some of these functions are analogous to those of trial courts. And like a trial court, the Board conducts hearings complete with opening and closing arguments, witness testimony, and evidence; it produces a written opinion. *See* AS 39.35.040; 2 AAC 35.150, .160, .170. The Board is free to question the witnesses during the hearings. 2 AAC 35.160(b). The Board may consider evidence that the parties did not present to the admin-

istrator. 2 AAC 35.160(d). It also has a duty to "submit its findings to the administrator." AS 39.35.040(4).

Although Stalnaker's argument is not without merit, we find Williams's analogy more apt. As this case illustrates, the Board is to make findings, including findings based on new evidence not presented to the administrator. We believe that the Board's duty to make such findings distinguishes it from appellate bodies, which only review the records from earlier proceedings. Therefore, we do not believe that the appellate court "tie affirms" policy applies to the Board.

### 3. Should the superior court have left undisturbed the Board's determination of the effect of a tie vote?

Stalnaker asserts that, by ordering the tie-breaking vote, the superior court substituted its own procedural rules for the Board's. He also argues that the Board's determination of the effect of the tie vote was reasonable and should not have been disturbed, and that Judge Hunt's order constituted impermissible judicial interference with the Board's discretion to fashion its own procedures.

Stalnaker cites cases that speak strongly in favor of giving administrative agencies latitude in designing their own procedures. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524–25, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) ("[T]his Court has for more than four decades emphasized that the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments."); *Federal Communications Comm'n v. Schreiber*, 381 U.S. 279, 290–91, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965) ("[I]n providing for judicial review of administrative procedural rule-making,

Congress has not empowered district courts to substitute their judgment for that of the agency."). The United States Supreme Court, then, has cautioned courts against imposing procedural rights or requirements on agencies.

The Board's amicus brief discusses the Board's quorum rules, noting that "not all members of a multi-member board will be present at all meetings." The Board argues that the quorum rules ensure that "the Board's work is done even when all Board members are not present."

■ The parties to this case argued before six-member Board panels in 1992 and 1994, and neither party objected to the panels. The Board impliedly argues that Williams may not object to the tie vote since she did not object when the possibility of a tie first arose.

Although public policy favors timely objections, it more strongly favors clear agency regulations. This case is a good example, because the Board first informed Williams of the "tie affirms" rule after the six-person Board had voted and announced its decision.[9] Unwritten rules might facilitate faster, less formal decisions, but they also allow an agency to act in an arbitrary or discriminatory manner. We have recognized "the two basic public policy interests served by impartial decision-making: accuracy of decisions, and the avoidance of the appearance of impropriety." *Griswold v. City of Homer*, 925 P.2d 1015, 1028–29 (Alaska 1996). Announcing a "tie affirms" practice only after a vote has been taken tends to raise suspicions of *post hoc* expediency. Moreover, the practice was not embodied in an agency regulation or any written policy when the Board ruled; we agree with Judge Hunt that "[t]here is no procedure in place for the court to consider

---

9. In the one previous Board hearing that ended with a tie vote, the Board stated that the tie vote affirmed the Director's decision. In that case (Decision 93–12), the Board explained:

> [A] tie vote ... produces a circumstance whereby the majority of the Board has not overturned the decision of the Director of the Division. Similarly, the tied vote establishes that [the employee] has not met his burden of proof of establishing to a majority of the Board that the Director was in error. While there is

> no statute or regulation specifying what happens in the event of ties in Board decisions on appeals of this nature, the common law assessment of decision-making by boards such as this one holds that a tied vote results in the appealed-from decision standing without reversal.

That proceeding involved a different claimant, and Stalnaker does not claim that Williams was aware of the "tie affirms" rule when the six-person Board conducted the June 1994 hearing.

and give deference to." That Williams twice accepted six-member panels should not preclude her from raising this issue. Absent prior notice of the policy, a claimant's acceptance of a panel with an even number of members does not warrant a finding of waiver; it is also consistent with expectations of either outright victory or, in the event of a tie, referral to the absent member.

We do not believe that the informal, unwritten "tie affirms" practice, followed only once before, rises to the level of an agency regulation deserving deference from the court. In addition, AS 39.35.040(4) requires the Board to make and submit findings to the administrator, and a tie vote does not satisfy that requirement.

In ordering a tie-breaking vote, Judge Hunt appropriately resolved this issue.

### C. The Attorney's Fees Award

Stalnaker asserts that it was an abuse of discretion to award Williams eighty-six percent of her actual attorney's fees. He notes that the court did not find that he had litigated in bad faith or presented frivolous claims. He suggests that, although Alaska Civil Rule 82 does not govern attorney's fees awards on appeal, it is a useful guide for assessing the reasonableness of such awards. He believes that, under our interpretation of Civil Rule 82, successful litigants should receive only a "small percentage" of their attorney's fees unless the court finds "special circumstances," such as misconduct by the losing party. He concludes that the award should not exceed fifty percent of the claimed attorney's fees.

Williams argues that the superior court had "broad discretion to award significant, partial fees to the prevailing party." She also contends that Civil Rule 82 and the cases interpreting it do not apply. She concludes that the award was reasonable and falls within the discretion of the superior court.[10]

Alaska Appellate Rule 508(e) governs attorney's fees awards on appeals.[11] A superior court hearing an appeal from an administrative agency awards attorney's fees under Appellate Rule 508, not Civil Rule 82. *Carr–Gottstein Properties v. State*, 899 P.2d 136, 148 (Alaska 1995); *Diedrich v. City of Ketchikan*, 805 P.2d 362, 371 (Alaska 1991). In *Carr–Gottstein* we found that the Civil Rule 82 guidelines helped the trial court calculate a "reasonable" award in a case that did not result in a money judgment. *Carr–Gottstein*, 899 P.2d at 148–49. We did not, however, require courts invariably to follow those guidelines; we simply found that the guidelines offer one way to reach a reasonable award.

We have limited awards under Appellate Rule 508(e) in two respects. First, such awards should address the fees incurred on the appeal to the superior court, not those incurred in the underlying administrative proceeding. *See, e.g., Kenai Peninsula Borough v. Cook Inlet Region, Inc.*, 807 P.2d 487, 501 (Alaska 1991). Second, the award "should only partially compensate the prevailing party for attorney's fees." *State v. Cacioppo*, 813 P.2d 679, 685 (Alaska 1991).

The time sheets submitted by Williams's attorney cover the period from July 25, 1994, to March 1, 1996, except for ten minutes of research on June 9, 1994. The PERB heard Williams's case (after Judge Hopwood's remand) in June 1994, and issued its written decision on June 27. Williams filed an appeal with the superior court on February 15, 1995. Judge Hunt remanded the case to the absent Board member on February 27, 1996,

---

10. We review awards of attorney's fees for abuse of discretion. *See Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n*, 836 P.2d 343, 348 (Alaska 1992); *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 907 (Alaska 1987). We will find an abuse of discretion only "when we are left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling." *Peter Pan Seafoods. Inc. v. Stepanoff*, 650 P.2d 375, 378–79 (Alaska 1982).

11. Alaska Rule of Appellate Procedure 508(e) provides: "Attorney's fees may be allowed in an amount to be determined by the court.... If the court determines that an appeal or cross-appeal is frivolous or that it has been brought simply for purposes of delay, actual attorney's fees may be awarded to the appellee or cross-appellee."

and denied reconsideration of that order in April 1996. Thus, except for the June 1994 legal research, it appears that Williams requested fees only for work done on the appeal, not for work done on the administrative hearing.[12]

An award of eighty-six percent of actual fees also seems to comply with *Cacioppo*'s requirement of partial rather than full compensation.[13] In *Cacioppo*, for instance, we held that, although full actual fees were inappropriate, "the trial court on remand may still exercise its sound discretion and award a substantial sum as partial attorney's fees, if persuaded the amount of fees to be awarded is justified and reasonable." *Cacioppo*, 813 P.2d at 685. We have also suggested some factors for trial courts to consider when calculating attorney's fees: "[t]he extent to which litigants have been involved in prior administrative proceedings, and the cost thereof, as well as the nature of judicial review and its cost (and the importance to the litigants of the rights asserted)." *Rosen v. State Bd. of Pub. Accountancy*, 689 P.2d 478, 482–83 (Alaska 1984).

In *Cacioppo* we noted the analogy between PERB disability claims and workers' compensation claims. 813 P.2d at 683. The analogy is not, however, reflected in our appellate rules, as a successful workers' compensation claimant is entitled to full reasonable attorney's fees, Alaska R.App. P. 508(g)(2), whereas a successful PERB claimant is limited to partial fees. But the similarity of PERB and workers' compensation cases makes Judge Hunt's award of substantial partial fees under Appellate Rule 508(e) seem reasonable. It was within the court's discretion to award a substantial percentage of the actual fees for this appeal, especially in light of the *Rosen* factors: Williams has been pursuing her case for years; the amount of her monthly disability payments probably is very important to her; and attorney's fees awards help ensure access to the appeals process for the unemployed. Judge Hunt could reasonably conclude that this case merited an award of eighty-six percent of the actual fees; this court concludes that she did not abuse her discretion.[14]

## IV. CONCLUSION

We AFFIRM the decisions of the superior court.

---

12. Although it is conceivable that the fee award encompasses some services performed before the appeal to Judge Hunt began, Stalnaker has not raised any such claim.

13. Judge Hunt originally awarded attorney's fees of $11,480—one hundred percent of Williams's counsel's claimed actual fees. After considering Stalnaker's motion for reconsideration, Judge Hunt modified her order, stating, "[t]he court in its discretion finds that 86% of actual fees is reasonable."

14. The author of this opinion believes that Appellate Rule 508(e) contemplates partial fees and that an award of eighty-six percent, while undeniably "partial," is excessive absent the existence of circumstances distinguishing this case from routine appeals from most administrative decisions. Ninety-nine percent is also "partial," and would be equally justified by the rationale of the court's decision on this issue. Nothing indicates that Stalnaker litigated in bad faith. He raised legitimate issues of potential merit. Although Civil Rule 82 does not govern such awards, recent amendments to that rule suggest an analytical structure that appears equally applicable to fees incurred on appeal.

This case does not fall within the exception to Appellate Rule 508 for workers' compensation appeals or within the court-created exception for public-interest litigation. Such a substantial award is also contrary to our own practice, in which we routinely apply Rule 508 to award fees to private parties prevailing in our court. Our awards, which typically do not exceed $1,000, are usually less, and often much less, than about twenty-five percent of the prevailing parties' actual fees.

Although PERB and workers' compensation claims are similar, Rule 508(g) expressly treats workers' compensation claims differently. Perhaps we should amend Rule 508, but its unamended language does not warrant this award.